## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **WOODFORDS FAMILY SERVICES, INC.,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **v.** | ) | No. 2:11-cv-445-DBH |
| | ) | |
| **LAURA CASEY** AND **LOOK AT ME NOW, LLC.,** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

## DECISION AND ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Woodfords Family Services, Inc. ("Woodfords") has filed a five-count Complaint in this federal court. Count I seeks declaratory judgment on a federal claim for copyright ownership. The other Counts seek declaratory and injunctive relief on four state law claims, namely, misappropriation of trade secrets, 10 M.R.S.A. § 1541, misappropriation of an idea, breach of fiduciary duty or confidential relationship, and unjust enrichment. Along with the Complaint, Woodfords filed a motion for a temporary restraining order and preliminary injunction based upon only the state law claims. During a conference with the Magistrate Judge, the parties agreed that I should decide that motion on the papers (which include affidavits) without a hearing or oral argument. I do so now.

The preliminary record establishes that Woodfords is seeking injunctive relief only for protection of an idea. Woodfords has not established a likelihood

of success on its claim that it has a trade secret, that the defendants have been unjustly enriched, or that they breached any duty of loyalty or confidential relations.  Maine law does not yet recognize the claim of misappropriation of an idea.  As a result, I **DENY** the motion for a temporary restraining order and preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

Woodfords, a Maine nonprofit organization, furnishes community-based family support and educational services to people with special needs.  Aff. of Dr. Paul Nau ¶ 2.  Woodfords' services include early childhood programs.  Id. These provide young children with developmentally appropriate experiences and activities that address cognition, speech and language development, gross and fine motor skills, and social and emotional behavioral development.  Id.

Woodfords hired the defendant Laura Casey as Program Director for its early childhood services program in 2007.  Aff. of Laura Casey ¶ 2; Nau Aff. ¶ 7.  Previously Casey had worked and published in the special education field. Casey Aff. ¶ 14.  Beginning in 2010, at Casey's urging, Woodfords took certain steps to develop a video self-modeling product for children with special needs such as autism.  Casey Aff. ¶¶ 18-19; de Bree Aff. ¶ 4.  On September 1, 2011, Casey resigned her employment.  Casey Aff. ¶ 3; Nau Aff. ¶ 41.  The record contains no reference to a noncompete agreement.  Now Casey intends to launch a website under the auspices of Look at Me Now, LLC, the other defendant in this lawsuit, a limited liability company owned by Casey and her father, John Fitzgerald.  Casey Aff. ¶¶ 6-7; Fitzgerald Aff. ¶ 3.  The website will

market various video self-modeling products that families can purchase and use over the internet.  Look at Me Now Webpages (Docket Item 3-17).

Self-modeling videos for special needs children have been around for years.  Aff. of Jeremy Usher ¶ 3; Aff. of Kerry de Bree ¶ 14; Casey Aff. ¶ 12; Nau Aff. ¶ 20.  Typically they have been created by videoing a special-needs child and editing for only the desired behavior.  Usher Aff. ¶ 5; de Bree Aff. ¶ 14; Casey Aff. ¶ 12; Nau Aff. ¶ 20.  The edited videos then are used to reinforce the desired behavior.  What is new about the self-modeling product in this dispute is that via the internet and digital technology, it proposes to enable the photographed face of a special needs child to be placed on the filmed body of a "nondescript" child (without special needs) modeling the appropriate behavior.  Casey Aff. ¶ 15.  The special needs child can then view the video as if it were him/herself.  Id.  On the preliminary record, Woodfords has not disputed Casey's statements that she conceived of the idea in 2005 well before Woodfords employed her, and that she told others of her idea at that time.  Casey Aff. ¶¶ 13-14; Fitzgerald Aff. ¶ 7.[1]  But the parties seem to dispute how far she and/or Woodfords developed the idea after Woodfords employed her.[2]  The record does not show that Casey took any technical knowledge away from

---

[1] Nau's affidavit states that "[a]ll of Ms. Casey's work in the conceptualization and development of the video self-modeling product was within the scope of her employment.  Nau Aff. ¶ 31.  While that says her work on the idea while at Woodfords was within the scope of her employment, it does not dispute that she brought the idea with her and had previously disclosed it to others.

[2] The Director of Development states that "through various meetings and discussions taking place from around April 2010 through June of the same year, we decided that Woodfords' video self-modeling product should be web-based."  De Bree Aff. ¶ 15.  There are no additional references in the record to the idea of the creation of a web-based product and Woodfords does not assert that it is the web-based characteristic over which it claims ownership.

Woodfords.  Usher Aff. ¶¶ 4, 19; Casey Aff. ¶ 8.  Instead, the issue is over the use of the idea—web-based superimposition of a special needs child's photographed face on the videotaped body of another child performing a particular activity.[3]

Several Woodfords-related personnel have spent time on the project, but the amount of time and how far the project has proceeded are both disputed. Casey Aff. ¶¶ 25-28; Nau Aff. ¶ 27; de Bree Aff. ¶ 24.  During Casey's employment, Woodfords applied for and obtained grants from the Maine Technology Institute ($12,500) and the Sam L. Cohen Foundation ($7,500) for the video-self modeling product.  Nau Aff. ¶¶ 26, 29.  Grant money such as this paid part of Casey's salary, and the Maine Technology grant explicitly provided for her working on the project.  Nau Aff. ¶ 27.  Woodfords has completed a 2-minute video of a child brushing his teeth (Casey's son), but the child is not

---

[3] Woodfords says in its legal memorandum that the information Casey took from it
            relates to a method, technique, or process through which
            traditional video self-modeling techniques are combined with
            recent technological innovations to quickly and easily create a
            product that can be accessed and distributed on a large scale and
            in a relatively short amount of time. According to Woodfords
            research, before Defendants created lookatmenow.org, no similar
            products were commercially available, and there was no
            indication that similar products were in development, or that
            competitors were utilizing similar methods, techniques, or
            process to create, market, or distribute similar products.
Mot. for TRO & Prelim. Inj. at 9 (Docket Item 3).  But nowhere does Woodfords describe any techniques or technology that it developed beyond the idea.  Woodfords did make a 2-minute video of Casey's son brushing his teeth, but he is not a special needs child and the record does not show that this alone would be used for video self-modeling.  de Bree Aff. ¶ 23; Casey Aff. ¶ 27.  Although de Bree asserts that "Woodfords is currently in the process of creating additional videos and further developing the video self-modeling product," there is no evidence in the record that Woodfords has taken any additional steps to develop the product since it videoed Casey's son in June 2011.  de Bree Aff. ¶ 24.  In contrast, the third party hired by Casey and Look at Me Now to develop the idea into a working procedure describes how he has had to build the system basically from the ground up and that Casey brought him nothing but the idea.  Usher Aff. ¶ 4.

special needs, Casey Aff. ¶ 27, and Woodfords describes no technology or plan for superimposing a special needs child's face on the video.

After Casey's resignation, Casey's attorney provided notice that any works that Casey created relating to video self-modeling while at Woodfords were her exclusive property and that she possessed all copyright, patent, trade secret or other intellectual property rights and/or interests in them.  See Ex. A to Pl.'s Compl.  In response, Woodfords filed this lawsuit, claiming ownership of the video self-modeling product.  Woodfords requests injunctive relief "prohibiting Defendants from using Woodfords' confidential proprietary information, including its trade secrets and ideas related to the Video Self-Modeling Product."  Mot. for TRO & Prelim. Inj. at 17-18 (Docket Item 3).

The Look at Me Now website is currently under construction and scheduled to launch imminently, but the defendants have delayed temporarily while this motion is briefed and decided.

## ANALYSIS

### A.    *Subject Matter Jurisdiction*

Although neither party has raised jurisdictional concerns, I must be satisfied that I have jurisdiction over the case.  The only count in Woodford's Complaint that could supply federal jurisdiction is the claim for copyright ownership in Count I.[4]  The Copyright Act provides that copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  An exception exists, however, for "works made for hire."  In that case, "the

---

[4] Because the citizenship of the parties is not diverse, I must determine whether the anticipated cause of action presents a federal question by arising under the Copyright Act.

employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary.  Id. § 201(b).  The Act defines a "work made for hire" as "a work prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101(1).

The owner of a copyright has several exclusive rights under the Copyright Act, the most relevant being the rights to reproduce the work, create derivative works, and distribute the work.  17 U.S.C. §§ 106(1)-(3).  Even if a complaint does not state a Copyright Act claim on its face, federal jurisdiction may be appropriate if resolution requires application of the work-for-hire doctrine of the Copyright Act.  The Supreme Court examined work-for-hire in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989).  That case involved an ownership dispute between an artist hired to produce a sculpture and the organization that hired him.  Id. at 733.  The Supreme Court determined it had to "construe the 'work made for hire' provisions of the Copyright Act."  Id. at 732.  In that context, the Court reasoned that "[e]stablishment of a federal rule of agency, rather than reliance on state agency law, is particularly appropriate here given the Act's express objective of creating national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation."  Id. at 740 (citing 17 U.S.C. § 301(a)).  "This practice reflects the fact that 'federal statutes are generally intended to have uniform nationwide application.'"  Id. (quoting Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43 (1989)).  Thus, such a dispute can create a federal question.

In this case, the Complaint asserts Woodford's ownership of the video self-modeling product, while at the same time acknowledging that ownership is disputed. The determination of whether the work was "made for hire" can be controlled by a contract or the Copyright Act itself. The parties do not assert that there is a contract that controls the employment relationship in this case. Because there is no dispute that Casey was an employee of Woodfords, the question whether Woodfords owns the video self-modeling product copyright turns on whether Casey prepared the product within the scope of her employment. These allegations directly implicate the Copyright Act and, therefore, the action arises under federal law.

But the copyright statute also provides that registration is a prerequisite to an action for copyright infringement. 17 U.S.C. § 411(a) ("[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."). There is no assertion that anyone has tried to register a copyright in this dispute. In Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237, 1241 (2010), however, the Supreme Court held that registration is an element of an infringement claim rather than a jurisdictional bar. The Court "decline[d] to address whether § 411(a)'s registration requirement is a mandatory precondition to suit that . . . district courts may or should enforce sua sponte by dismissing copyright infringement claims involving unregistered works." Id. at 1249. I decide that sua sponte dismissal is not called for in this case because Woodfords does not assert a claim for infringement or request any copyright damages, but seeks

only a determination of ownership.  The statute does not say that registration is necessary for such a claim.

I therefore conclude that at this stage I have jurisdiction to proceed with the case[5] and I turn to the motion for a temporary restraining order and preliminary injunction.

**B.    *Temporary Restraining Order/Preliminary Injunction***

Woodfords seeks a temporary restraining order and preliminary injunction not on its federal copyright claim but on its four state law-based claims:  misappropriation of trade secrets, 10 M.R.S.A. § 1541, misappropriation of an idea, breach of fiduciary duty or confidential relationship, and unjust enrichment.

To obtain a temporary restraining order or preliminary injunction, Woodfords must show: (1) a likelihood of success on the merits on at least one of its state law claims; (2) a significant risk that it will suffer irreparable harm if I do not enjoin the defendants; (3) harm to Woodfords that outweighs any harm that the temporary restraining order will cause to the interests of the defendants; and (4) satisfaction of the public interest.  Winter v. NRDC, Inc., 555 U.S. 7, 19 (2008); see also Curnin v. Town of Egremont, 510 F.3d 24, 28 (1st Cir. 2007).  The most important factor is likelihood of success on the merits:  "The sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  Wine &

---

[5] I do not decide whether Woodfords or the defendants has/have anything that is copyrightable beyond the actual videos that have been created.

Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005) (quoting

New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir.

2002)).

     I therefore examine each of the four state law claims, starting with the

most important part of the inquiry, the likelihood of success on the merits.

     **1.**    ***Likelihood of Success***

     **a.**    ***Misappropriation of Trade Secrets***

     Woodfords contends that the information related to the video self-

modeling product is a "trade secret" and that Casey violated the Maine Trade

Secrets Act by disclosing it.   See 10 M.R.S.A. §§ 1541-1548.[6]   Maine law

defines a "trade secret" as:

> information, including, but not limited to, a . . . method,
> technique or process, that: derives independent economic
> value, actual or potential, from not being generally known
> to and not being readily ascertainable by proper means by
> other persons who can obtain economic value from its
> disclosure or use; and is the subject of efforts that are
> reasonable under the circumstances to maintain its
> secrecy.

10 M.R.S.A. § 1542 (4).[7]

---

[6] "Misappropriation" is defined as:

> Acquisition of a trade secret of another by a person who knows or
> has reason to know that the trade secret was acquired by
> improper means; or disclosure or use of a trade secret of another
> without express or implied consent by a person who: . . . at the
> time of disclosure or use, knew or had reason to know that his
> knowledge of the trade secret was . . . acquired under
> circumstances giving rise to a duty to maintain its secrecy or limit
> its use . . . .

10 M.R.S.A. § 1542(2).  The parties' argument has not focused on whether this definition fits
Casey's conduct, so I do not address that topic either.

[7] Since the parties have not argued that this definition does not encompass the subject of their
dispute, I assume without deciding that it fits the definition.

Courts examine the following factors to determine whether information derives independent economic value from not being generally known or readily ascertainable:

> (1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain or rendered the information "readily ascertainable" through patent applications or unrestricted product marketing.

Spottiswoode v. Levine, 730 A.2d 166, 175 n.6 (1999) (internal citations omitted).

On factor (1), it is undisputed that the idea here has value to Woodfords and its competitors.  The amount is not quantified, but it is significant.

On factor (2), it is also undisputed that Woodfords did spend money and effort to develop the idea.  Woodfords applied for and obtained the two grants totaling $20,000, invested the time of Casey, Director of Development Kerry de Bree, a parent/volunteer Jessica Meehan, current Executive Director Paul Nau and the Board, and obtained and paid for a 2-minute video of Casey's son brushing his teeth.

No facts or arguments are provided on factor (4) (ease with which others could acquire or duplicate the information—although it seems only a matter of time until someone else will think of the idea), or factor (5) (what third parties have done).

The dispute is over factor (3), whether Woodfords took reasonable measures to guard the secrecy of the idea.  See 10 M.R.S.A. § 1542(4)(B) (In order for information to qualify as a trade secret, it must be "the subject of efforts that are reasonable under the circumstances to maintain secrecy."). When deciding whether efforts are reasonable, courts examine the following factors:

> (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which employees and others involved in the plaintiff's business know the information; (3) the nature and extent of measures the plaintiff took to guard the secrecy of the information; (4) the existence or absence of an express agreement restricting disclosure; and (5) the circumstances under which the information was disclosed to any employee, to the extent that the circumstances give rise to a reasonable inference that further disclosure without the plaintiff's consent is prohibited.

Spottiswoode, 730 A.2d at 175 n.7 (internal citations omitted).

With respect to the first factor—knowledge of the idea outside the plaintiff's business—before engaging in the development of the video self-modeling product, Woodfords canvassed the landscape of video self-modeling and found nothing like the face replacement idea envisioned by Casey.  de Bree Aff. ¶ 16.  Woodfords has continued to monitor the field and has found no comparable product on the market as yet.  Id.  However, the evidence also reveals that a number of individuals outside of Woodfords knew of the idea, including Casey, Fitzgerald (her father), Meehan, two former colleagues of Casey and unnamed friends of Casey.

With respect to factor two—the extent to which others in the plaintiff's business know the information—the record indicates that a number of

Woodfords employees knew of the project.  de Bree Aff. ¶¶ 12-15; Nau ¶¶ 13, 19; Casey ¶ 20.

On factor three—measures that the plaintiff took to guard secrecy—the record shows that Woodfords took some limited steps to maintain the secrecy of the video self-modeling product.[8]  The record does not show that Casey was personally instructed on secrecy concerning her idea.  In March 2010, however, when Casey and de Bree presented to the Woodfords Facilities and Resource Development Committee ("WFRD Committee") a concept of a museum for special needs children, one of whose features would be videos on which the face of a special needs child could be superimposed, de Bree Aff. ¶ 8; Casey Aff. ¶ 22, Woodfords' then-Executive Director Richard Farnsworth informed the meeting attendees that everything discussed there was to be kept confidential, and should not be discussed outside of that Committee.  de Bree Aff. ¶ 9.  In addition to Casey, de Bree, Farnsworth, Nau, and other members of that Committee, a parent volunteer, Jessica Meehan, was recruited to work on the idea of the video self-modeling.  de Bree Aff. ¶ 12.  The record does not disclose that she was instructed on secrecy.  Later, when representatives of Woodfords met with personnel from an outside company, Current Motion Videographers, to discuss the production of videos that would include the self-modeling product, Woodfords explained to them that all of the information provided to them that day and in the future must be kept confidential.  de Bree Aff. ¶ 17.

---

[8] Although the Maine statute explicitly provides procedures that courts can use to maintain the secrecy of the alleged trade secret, none of the parties has made any such requests.  See 10 M.R.S.A. § 1546.

Sometime later, Woodfords had representatives from Current Motion sign work-for-hire and non-disclosure agreements in order to protect Woodfords' rights and interests in the video self-modeling product.  de Bree Aff. ¶ 17.  de Bree also states that Woodfords intentionally left references to the grants and video self-modeling product vague in public materials, and limited the type and amount of information regarding the video self-modeling product that circulated within and outside of Woodfords.  de Bree Aff. ¶ 22.

Woodfords also asserts that "all employees are responsible for protecting and preserving Woodfords' assets, including information" and cites the Agency Compliance Plan for support.  Woodfords does not, however, point to any specific provision of that document.  Mot. for TRO & Prelim. Inj. at 3 (citing Nau Aff. Ex. C).  Under the heading "Financial Compliance—Managing Resources and Assets," I observe that the Agency Compliance Plan provides:

> Woodfords Family Services follows strict financial policies in order to safeguard and manage the resources and assets of persons served, and the agency as a whole, in order to achieve maximum use for the benefit of all parties.  It is the responsibility of all employees, volunteers and interns to protect and preserve agency assets including but not limited to employee time, materials, supplies, petty cash, personal spending monies, equipment, properties and information.  Such assets are to be maintained for business/programming-related purposes only, and the agency maintains a system of internal controls to assure reasonably that assets are used in this manner.

Agency Compliance Plan (Docket Item 3-8).  This general policy statement regarding preservation of agency assets is hardly a clear statement that information like that at dispute in this case must remain confidential.

Nau's affidavit recounts that Casey received and approved a number of Woodfords' personnel documents on an annual basis, Nau Aff. ¶ 3, and seeks

13

the inference that some of those documents required Casey to maintain confidentiality with respect to the idea.  Nau Aff. Exs. A,B, C and D.  I have reviewed those documents and note the reference to HIPPA regulations for confidentiality of client health information, Agency Compliance Plan at 11, and a reference to confidential information that consumers entrust to Woodfords, Acceptable Use Agreement (Docket Item 3-7), but I find nothing that required Casey to maintain the confidentiality of the idea at issue here.

There are no Maine cases specifically addressing what constitute reasonable steps to maintain secrecy of an alleged trade secret.  In discussing the efforts to maintain secrecy for a claim of misappropriation of trade secrets under Massachusetts common law, however, the First Circuit stated that it is not sufficient to keep something "private from the world . . . .  Instead, there must be affirmative steps to preserve the secrecy of the information *as against the party against whom the misappropriation claim is made*."  Incase v. Timex, 488 F.3d 46, 53 (1st Cir. 2007) (emphasis added).  Here, that would be Casey.  Other than Farnsworth's general statement to the WFRD Committee that the subject matter of the meeting was to remain confidential, there is no evidence that anyone from Woodfords specifically told Casey that she should preserve the secrecy of the idea.  Casey in her affidavit says that she brought the idea with her to Woodfords when Woodfords hired her, not that she developed it after being hired. Casey's curriculum vitae shows her use of video modeling social initiatives in the classroom in 2003.  Casey Aff. Ex. A (Docket Items 22-23).  She asserts that in 2005 she knew of Face Replacement Technology (the current terminology), having seen it on America's Funniest Home Videos.

Casey Aff. ¶ 13.  She discussed then with friends and colleagues how it might be used in video self-modeling to improve teaching methods for autistic and special needs children.  Casey Aff. ¶ 13; Fitzgerald Aff. ¶ 7.  She used a crude version of the idea of combining video self-modeling with face replacement technology (face imposed on an animated graphic) while teaching at a school for autistic and special needs children in 2005.  Casey Aff. ¶ 14.  There is no evidence that Woodfords asked Casey to contact individuals to whom she had previously disclosed her idea and tell them the idea was now to be confidential information of Woodfords.

With respect to the fourth factor—an express agreement restricting disclosure—Woodfords had no express agreement with Casey on the topic.

On the last factor—the circumstances under which the information was disclosed to any employee—there is no additional evidence in the record that Woodfords told employees that any further disclosure without Woodfords' consent was forbidden.

Thus, the record establishes that Woodfords engaged in only limited efforts to maintain the secrecy of the project.  Farnsworth told the attendees of the WFRD Committee's museum meeting that "everything discussed [at the meeting] was to be kept confidential," de Bree Aff. ¶ 9.  In addition, the individuals at Current Motion were told to keep the project confidential and, at Woodfords' request, Current Motion signed a non-disclosure agreement.  On the other hand, Woodfords did not extract from Casey an express agreement to

maintain the secrecy of the project,[9] and the record does not establish that Meehan was told it was confidential.  Moreover, there is no evidence that once Woodfords decided to develop the project, Casey was specifically told that the idea was now confidential or that it instructed Casey to notify individuals with whom she previously shared her idea that the idea must now remain confidential.  Notwithstanding Farnsworth's admonition to members of the WFRD Committee and the non-disclosure agreement with Current Motion, Woodfords' failure to notify Meehan to maintain confidentiality and its failure to specifically instruct Casey about the secrecy of her idea lead me to conclude on this record that Woodfords has not shown a likelihood of success on the proposition that it took reasonable steps under these circumstances to maintain secrecy of the idea and thus that it was a trade secret belonging to Woodfords.[10]

### b.   *Misappropriation of an Idea*

Woodfords has cited no Maine statute or caselaw that provides a cause of action for the misappropriation of an idea, and I have found none.  Woodfords

---

[9] Although nothing was put in writing, de Bree states that there was a "general understanding" among the individuals working on the museum project and, later, the Video Self-Modeling Project, that the information related to both was to be kept confidential.  de Bree Aff. ¶ 10.  Specifically, de Bree asserts that "[t]he individuals involved, including Casey, understood that we needed to maintain confidentiality because the video self-modeling product was a unique idea that had significant potential to create revenue for Woodfords."[9]  de Bree Aff. ¶ 10.  No foundation is provided for this testimony about what others "understood."  This is not competent evidence to show that Woodfords took efforts to guard its secrecy.

[10] Moreover, in order to prevail on its claim for misappropriation of trade secrets, Woodfords must establish that it owns that which it is striving to keep secret.  The only support for Woodfords' ownership is found in Nau's affidavit where he makes the ambiguous statement that "[a]ll of Ms. Casey's work on the conceptualization and development of the video self-modeling product was within the scope of her employment as Program Director."  Nau Aff. ¶ 31.  This may have been so, once Casey started working for Woodfords.  But given Casey's specific statements about conceiving and sharing the idea with colleagues and friends years before joining Woodfords, Woodfords must provide more to support its assertion that her work on it at Woodfords gave rise to Woodfords' ownership.

does cite four cases applying law from some other states, <u>Irizarry v. President and Fellows of Harvard College</u>, 248 F.2d 799 (1st Cir. 1957); <u>Downey v. General Foods Corp.</u>, 286 N.E.2d 257 (N.Y. 1972); <u>Tele-Count Engineers, Inc. v. Pacific Telephone and Telegraph Co.</u>, 214 Cal. Rptr. 276 (Cal. 1984); <u>Desny v. Wilder</u>, 299 P.2d 257 (Cal. 1956), but I would be creating new Maine law to recognize such a cause of action here.  The First Circuit has cautioned that a plaintiff should not choose a federal forum when it seeks to assert a novel state law cause of action.  <u>See</u> <u>Hatch v. Trail King Industries, Inc.</u>, 656 F.3d 59, 70 (1st Cir. 2011) ("Massachusetts courts have not adopted plaintiffs' theory of the case, and we, as a federal court, have no warrant to extend state product liability law."); <u>Warren v. United Parcel Serv., Inc.</u>, 518 F.3d 93, 100 (1st Cir. 2008) ("[A] federal court applying state law must be hesitant to blaze a new (and contrary) trail." (quoting <u>Kassel v. Gannett Co.</u>, 875 F.2d 935, 949 (1st Cir. 1989))); <u>Andrade v. Jamestown Hous. Auth.</u>, 82 F.3d 1179, 1186–87 (1st Cir. 1996) ("[A]s a federal court hearing this state law issue . . ., we are reluctant to extend [state] law 'beyond its well-marked boundaries.'" (quoting <u>Markham v. Fay</u>, 74 F.3d 1347, 1356 (1st Cir. 1996))).  I conclude, therefore, that Woodfords does not show a likelihood of success on this claim.

### c.  *Breach of Confidential Relationship or Fiduciary Duty*

Woodfords has cited no Maine cases that recognize a confidential relationship based solely upon employment status.[11]  (Woodfords apparently

---

[11] The plaintiff cites one employment case in this section of its brief, <u>Burten v. Milton Bradley</u>, 763 F.2d 46, 462-63 (1st Cir. 1985), but that is a First Circuit case applying Massachusetts law, and it views the confidential relationship tort there as a species of misappropriation of ideas, a doctrine Maine has not yet recognized.  Moreover it states that "[t]he essence of the
*(continued next page)*

did not have a non-compete or confidentiality agreement with its employees.)
To create a confidential relationship, the Maine cases that Woodfords cites
require seriously unequal bargaining power, an element not established here.[12]
On the claimed breach of confidential relationship, Woodfords' argument is
that

> Woodfords placed Casey in a position of confidence and
> trust by allowing her access to confidential proprietary
> trade secrets, information, and ideas related to the Video
> Self-Modeling Product.   Casey abused this confidence by
> misappropriating those trade secrets, pieces of information,
> and ideas for her own benefit and the benefit of LMN, and
> sharing them with her father.

Mot. for TRO & Prelim. Inj. at 13.  That assertion is not enough.  If Woodfords
cannot establish that the idea is a trade secret or that Maine law recognizes
appropriation of an idea, the confidential relationship cases will not allow it to
bootstrap its way into a likelihood of success for the temporary restraining
order and preliminary injunction.

    For recognition of a fiduciary duty of loyalty in an employment
relationship, Woodfords cites no Maine cases, but only the RESTATEMENT (THIRD)
OF AGENCY §§ 8.04, 8.05.  The Maine treatise on Remedies makes no mention of
such a claim in its chapter on employment contracts, Andrew M. Horton and
Peggy L. McGehee, MAINE CIVIL REMEDIES ch. 13 (4th ed. 2004), but because the
Maine Law Court often follows the Restatements, I will consider it.  Woodfords

---

wrong is generally 'the breach of the duty not to disclose or to use without permission
confidential information acquired from another.'"  Id. (quoting Jet Spray Cooler, Inc. v.
Crampton, 385 N.E.2d 1349, 1354 (Mass. 1979)).  The record here shows that Casey brought
the idea with her to Woodfords.

[12] For example, in Stewart v. Machias Savings Bank, 762 A.2d 33, 46 (Me. 2000) (quoting
Diversified Foods, Inc. v. First National Bank of Boston, 605 A.2d 609, 615 (Me. 1992)), a
bank-borrower dispute, the Law Court required the borrower to "demonstrate 'diminished
emotional or physical capacity or . . . the letting down of all guards and bars.'"

argues that Casey actively competed with it while still a Woodfords employee and that she improperly gave information to her father during that time. As for the information provided to Casey's father, Woodfords by its own admissions welcomed this initiative at the time and invited him to a meeting to discuss his making an equity investment in the project. Nau Aff. ¶¶ 32-33. Woodfords otherwise presents no evidence of actual competition during Casey's employment.

In her responding memorandum, however, Casey seems to admit that she took steps to *prepare* to compete with Woodfords. The memo acknowledges that the defendants hired Firefly LLC in August 2011 to design and develop a video self-modeling product with face replacement capability. Defs.' Opp'n to Pl.'s Mot. for TRO at 6 (Docket Item 17); Usher Aff. ¶ 2. At that time, Casey was still a Woodfords employee. RESTATEMENT § 8.04 prohibits competition by an employee during the course of employment, but it does not prohibit an employee from taking steps in preparation for becoming a competitor. RESTATEMENT (THIRD) OF AGENCY § 8.04 ("During [the agency relationship], an agent may take action, not otherwise wrongful, to prepare for competition following the termination of the agency relationship."). Although Casey engaged Firefly while still working for Woodfords, there is no evidence that the defendants competed before Casey left Woodfords on September 1, 2011, or even that Firefly completed the competing product before September 1, 2011. Thus, because there is no evidence that Casey did any more than prepare to compete with Woodfords, there is no likelihood of success on this claim.

19

With respect to the Restatement provision on the use of confidential information, RESTATEMENT (THIRD) OF AGENCY § 8.05, I have found above that Woodfords has failed to show that it took reasonable steps to preserve the confidentiality of the idea.  Maybe Woodfords will establish at trial that Casey is breaching a duty of loyalty with respect to confidential information.  But the record before me now is that Casey had originated the idea and discussed it with others even *before* she came to Woodfords and there is no evidence that Woodfords admonished Casey that her idea had thereafter become secret.  Moreover, the record is in dispute in terms of what further development to the idea occurred during Casey's tenure at Woodfords and how seriously Woodfords was pursuing it before Casey left.  I conclude that Woodfords has not made out a likelihood of success on the merits on its claimed breach of either fiduciary duty or confidential relations at this stage.

### d.    *Unjust Enrichment*

Woodfords recognizes that

> To establish a claim for unjust enrichment Woodfords must prove that (1) it conferred a benefit on Defendants, (2) Defendants had appreciation or knowledge of the benefit, and (3) Defendants' acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value.

Mot. for TRO & Prelim. Inj. at 13.  Woodfords adds that "unjust enrichment therefore permits recovery 'for the *value* of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to *pay* . . . .'"  Id. (emphasis added).  Here, however, Woodfords has no evidence that what Casey allegedly

took has unjustly enriched her, and it is not seeking payment of the value of the benefit.  For all I know at this stage, Casey and Look at Me Now, LLC will never gain value from their venture.  Then there would probably be no claim of unjust enrichment.  Unjust enrichment is just that, enrichment.  What Woodfords really wants here is to prevent use of the idea, whether the defendants gain or lose money as a result.  That is not the purpose of an action for unjust enrichment.

Therefore, I conclude that on the record as it stands now, Woodfords has not shown a likelihood of success on any of the four state-law claims.  That does not mean that Woodfords will not succeed on its federal copyright claim or, for that matter, that it will not gather evidence in discovery that will make its success probable on some of the state law claims by the time trial is reached.  But it does mean that Woodfords does not satisfy the most important of the four Temporary Restraining Order/Preliminary Injunction criteria.

I now turn briefly to the other three.

### 2.    *Irreparable Harm*

Woodfords probably satisfies the element of irreparable harm.  On this record it is doubtful that Casey has any resources to pay damages.  Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) ("It is settled beyond peradventure that irreparable harm can consist of a substantial injury that is not accurately measurable or adequately compensable by money damages.").  In addition, it will be difficult for

Woodfords to establish the value of the lost opportunity if the launch of Casey's business destroys Woodfords' chances to distribute a unique product. MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1242 (11th Cir. 2005) (Injuries in the form of lost opportunities are difficult, if not impossible, to quantify.).   The loss of an opportunity is probative of irreparable harm, particularly when such lost opportunities cannot be quantified or adequately compensated monetarily.   See e.g., Verizon Services Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1310 (Fed. Cir. 2007) (upholding grant of permanent injunction where plaintiff provided evidence that infringement resulted in "lost sales", "price erosion", and "lost opportunities to sell other services to the lost customers"); Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1261 (10th Cir. 2004).   Therefore, Woodfords has demonstrated that it will likely suffer irreparable harm.

### 3.   Balancing of the Interests

One or the other party is harmed however my decision comes down, and the potential harms appear to be fairly equal.  Casey and Look at Me Now need to proceed before someone else, maybe a third party, comes up with the same idea and implements it before they do, and Casey has a financial investment at stake.  By the same token, Woodfords wants to protect its ability to develop the idea, and Casey's marketing efforts could well impair the value of the project to Woodfords.  I conclude that this factor does not favor either party.

### 4.   Public Interest

The public interest generally is not a significant factor in a controversy between private parties.  It does appear that the special needs community

would be well served by this new product getting to market sooner rather than later.  But it is not for me to say which is the better route for putting the product on the market.  Thus, this factor does not cut in favor of either party.

CONCLUSION

Two of the factors favor neither side.  The most important factor, likelihood of success on the merits, favors the defendants.  Although Woodfords may suffer irreparable harm from their ongoing activities, that is not enough to support a temporary restraining order or preliminary injunction.  Woodfords cites the Federal Practice and Procedure treatise for the proposition that the likelihood of success on the merits should not be determinative, because that factor must be balanced against the hardships to the parties if an injunction is not granted.  Mot. for TRO & Prelim. Inj. at 7 (citing 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2948.3 (2d ed. 1995 & Supp. 2011).  The treatise goes on to state that a plaintiff may be entitled to a preliminary injunction even if his or her success on the merits is uncertain, if he or she demonstrates "a strong probability that he [or she] will be injured if the court fails to act."  Id. at 194-95 (2d ed. 1995).  But in a footnote to that proposition in the most recent pocket part, it signals a "But compare" to the First Circuit line of cases.  Id. at 74 (Supp. 2011).  I, of course, must follow the First Circuit, and likelihood of success here is the sine qua non, and on that basis Woodfords' motion fails.

For these reasons, the plaintiff's motion for a temporary restraining order and preliminary injunction is **DENIED**.  The Magistrate Judge should proceed to

enter a scheduling order that attempts to expedite discovery so that the parties can obtain a speedy resolution of their claims on the merits.

**SO ORDERED.**

**DATED THIS 14TH DAY OF DECEMBER, 2011**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

24